FILED & JUDGMENT ENTERED
Steven T. Salata

Dec 10 2012

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **MICHAEL L. BUTLER and** | ) | Case No. 10-32030 |
| **KATHY H. BUTLER,** | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| **JOHN MANGIONE,** | ) | Adversary Proceeding No. |
| | ) | 10-3314 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **MICHAEL L. BUTLER and** | ) | |
| **KATHY H. BUTLER,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM ORDER**

This action was filed by Plaintiff John Mangione ("Mangione") seeking to establish a

debt owed to him by the Debtors/Defendants Michael L. Butler and Kathy H. Butler (collectively

"the Butlers") and a declaration that the debt is non-dischargeable in the Butlers' bankruptcy

case, pursuant to section 523(a)(2) and (4) of the United States Bankruptcy Code. A trial was held on June 11, 2012 and a decision announced on June 19, 2012.  Both sides were present at trial and presented evidence. The Court also took judicial notice of the base case record, including the Butlers' bankruptcy schedules and filed statements.

The alleged debt in question stems from Mangione's purchase of 12 (twelve) PR Store franchises in the New York area from the Butlers' company, PRS Franchise Systems, LLC ("PRS") in May 2007. Those purchases occurred at a time in which PRS was not authorized to sell franchises in the State of New York.  Mangione contends that PRS and the Butlers failed to escrow his franchise payments as required by New York law pending the filing of an amended prospectus and its approval, by the state. Rather, PRS spent his purchase money, some $714,000.00. Mangione first sought to recover these sums from PRS in New York state court, only to have the Butlers file a personal bankruptcy.

Mangione now seeks the return of his franchise purchase money from the Butlers, on the contention that they as member-managers and the controlling principals of this entity, were materially involved in and directed both the unlawful solicitation and the failure to escrow his payments. Given their personal involvement in these unlawful acts of PRS, Mangione maintains that the Butlers are personally liable for his debt.

Mangione further maintains that the resulting $714,000 debt is non-dischargeable in bankruptcy as being occasioned by fraud and misrepresentations (11 U.S.C. § 523(a)(2)) as well as defalcation by fiduciaries (11 U.S.C. § 523(a)(4)).

For their part, the Butlers deny making any false assertions to Mangione and in fact deny any material involvement in his solicitation whatsoever.

Based on the evidence presented and the argument of counsel, the Court makes the

following findings of fact and conclusions of law.

## FINDINGS OF FACT

Each of the Butlers has long been employed in the area of public relations. Kathy Butler testified that she met Mike Butler around 1988, when she was working in retail marketing and he was working at a public relations firm. Mike Butler testified that he has owned public relations firms for thirty years.  In early 2001, the Butlers hit on an idea for a consulting entity that would serve the public relations needs of small businesses on a retail basis. PR Store was a retail store which assisted small businesses with developing and ordering marketing materials (such as logos, advertising, brochures, mailings, and web marketing) to promote their businesses. The Butlers opened their first "PR Store" in August 2001, and incorporated PR Store as an entity in March 2002. The member-managers of PR Store were Mike Butler, Kathy Butler, and Kathy Butler's son-in-law Dan Fragen. Their venture was so successful that the Butlers started to consider franchising the PR Stores to others.

To that end, in March 2002, the Butlers formed PRS Franchise Systems, LLC ("PRS"), which was to handle franchising of the PR Stores.  Mike and Kathy Butler were member-managers of PRS from its inception until the present date. Another original member-manager was Kathy Butler's son-in-law Dan Fragen ("Fragen").  By the end of 2005, PRS and the Butlers had hired one of their franchisees, Ira Distenfield, to broker and market the store franchises for PRS.

John Mangione ("Mangione") is a former high school band director and a resident of New York State.  After leaving the school system, Mangione owned and operated a small digital printing company in New York City. In early 2007, Mangione saw an article in a business publication describing PR Store as a retail, walk-in public relations business targeted toward

small businesses. Although he had no experience in marketing, Mangione thought the idea had merit.  He was interested in acquiring a PR Store franchise in New York.  Mangione made inquiry and received a variety of promotional materials from the company. One of these materials was an issue of Charlottebiz magazine, in which Mike Butler was featured on the cover as one of the creators and innovators (with his wife Kathy) behind PR Store, "one of the year's hottest new franchises". The magazine article discussed how the Butlers had been able to successfully franchise PR Stores across the country in the midst of the recession.

After reading these materials, Mangione called Distenfield, the franchise sales broker and a franchisee of perhaps the most successful store in the system. Mangione then traveled to Santa Barbara, California to visit with Distenfield and to see his store.  Distenfield talked glowingly about the chain and his relationship with Mike Butler, whom he indicated he spoke to at least two to three times a day.   These conversations resulted in the spring of 2007 in Mangione coming to Charlotte, North Carolina where the Butlers resided and ran a component business of PR Store known as Design Central. Mangione met with the Butlers and learned about the business and the franchise opportunities. The concept of PR Store was to use the franchise stores as sales units where a small business customer with public relations needs could come into the store and describe his needs to the franchisee. The creative work to supply those needs was to be performed in Charlotte through Design Central--by Mike and Kathy Butler and their staff.

Mangione was impressed by the Butlers and trusted them. Mangione believed their concept to be sound and that the business would grow, particularly in a municipality as large as New York City.

The Charlotte meetings resulted in Mangione entering into a series of Franchise Agreements with PRS dated April 24, 2007 and May 7, 2007. Under these agreements, PRS conveyed the franchise rights to Mangione to own and operate PR Stores in the New York area.

Specifically, on May 7, 2007 the Butlers, through PRS, prepared and tendered to Mangione a purported Franchise Agreement dated May 7, 2007. This was the final Franchise Agreement between the parties and amended its earlier written versions. Mangione purchased the exclusive rights to open up to 20 PR Stores in Nassau and Suffolk Counties in Long Island, New York and in the five boroughs of New York City (i.e. Manhattan, Queens, Bronx, Brooklyn and Staten Island).

The payment terms of Mangione's franchise purchases were set forth in a letter dated May 30, 2007, written by Daniel S. Fragen on behalf of PRS to Mangione, as follows:

**"Fees: The franchise fee for the Territory is $1,190,000. The Franchisor acknowledges $238,000 in franchise fees have already been received. Franchisee agrees to pay $120,000 on or before Tuesday, June 5, 2007; $56,000 to be paid on or before Wednesday, June 13, 2007, $300,000 to be paid on or before Monday, July 16, 2007. The remaining payment of $476,000 to be paid according to the following schedule:**

**$59,000 paid upon the execution of a lease for the 13th location**
**$59,000 paid upon the execution of a lease for the 14th location**
**$59,000 paid upon the execution of a lease for the 15th location**
**$59,000 paid upon the execution of a lease for the 16th location**
**$59,000 paid upon the execution of a lease for the 17th location**
**$59,000 paid upon the execution of a lease for the 18th location**
**$59,000 paid upon the execution of a lease for the 19th location**
**$59,000 paid upon the execution of a lease for the 20th location**

**The then current Franchise Agreement must be executed no later than the time a lease is executed for each of the above stores."**

Pursuant to the May 31, 2007 Letter Agreement, Mangione paid PRS a total of $714,000.00 between the dates of April 2007 to July 23, 2007:

**4/27/07 Check No. 1001 from Chase Home Equity Line of Credit - $59,500.00.**
**5/07/07 Check No. 1003 from Chase Home Equity Line of Credit - $59,500.00.**

**5/11/07 Check No. 1004 from Chase Home Equity Line of Credit - $59,500.00.**
**5/07 Check No. 1005 from Chase Home Equity Line of Credit - $59,500.00.**
**6/02/07 Check No. 287 from Commerce Personal account - $120,000.00.**
**6/11/07 Check No. 292 from Commerce Personal Account - $21,000.00.**
**6/11/07 Check No. 1007 from Chase Home Equity Line of Credit - $35,000.00.**
**7/23/07 Check No. 304 from Commerce Personal Account - $200,000.00.**
**7/23/07 Check No. 305 from Commerce Personal Account - $100,000.00.**

Mangione opened his first franchise in New York around September 2007. Initial response to the PR Stores was promising; however, within months Mangione's franchises began to experience difficulties. The primary problem with these franchises was an inability to provide product to the customers. By early 2008, only a few months after opening his first franchise, Mangione was experiencing difficulties getting the creative product from Design Central. Eventually, the failure of the Butlers through Design Central to provide the PR product to the New York franchises forced Mangione to seek outside sources to supply his clients' needs. This failure was surprising, given that the Butlers maintained that Design Central had a staff of approximately 25 people during the relevant time periods.

Mangione's problems were not isolated. The franchisor was foundering and soon failed. While the Butlers blamed the failure on the nonpaying franchise fees, this was not the case. The Butlers' PR businesses were never tenable because the bulk of the franchise sales proceeds were immediately dissipated by PRS to the principals. One-half of these monies were immediately paid to Distenfield as sales commissions. The remainder of the franchise sales proceeds were upstreamed by PRS to the Butlers' other corporations and were distributed to the member-managers as salaries. Fragen was paid $140,00.00 to $145,000.00 a year, Kathy Butler was making $100,000.00 a year, and according to her, Mike Butler was taking home $75,000.00.

By the companies' fiscal year end in December 31, 2007, PR Store and PRS' joint financial statements reflected a yearly loss of $174,611.00 on sales of $3,163,760.00. Further, the

companies had a negative capital account balance of $817,580.00.  Thus, by their own books, within seven months of entering into the franchise agreement with Mangione, the overall franchisor was insolvent both from a balance sheet and income statement perspective. Both PR Store and PRS would be dissolved in December 2009.

Doubtless this financial information would have affected Mangione's decision to purchase these franchises; however, such information was not available to him.   More importantly, Mangione was not told by the Butlers that PRS was not legally permitted to sell franchises in the State of New York at the time of his purchase.

New York State requires franchisors seeking to sell franchises within its geographic boundaries to be registered.   General Business Law § 680 et. seq.   Prior to soliciting (or advertising) sales of franchises, the franchisor must supply the State with a variety of financial information, including audited financial statements and its proposed prospectus. The New York registration system is similar to a SEC Solicitation Prospectus. The prospective franchisor's prospectus must be approved by New York in advance of any solicitations or advertising of the franchises.

At one time PRS had been authorized to sell franchises in New York State; however, its franchise had lapsed due to the company's failure to provide the state with required documentation and other information.  Mike Butler testified that this lapse was intentional. PRS simply allowed the franchise to lapse because it lacked business in New York at the time.  In fact, PRS's franchise registration expired on February 2, 2007, meaning several months before Mangione's purchase.   Because of Mangione's interest, PRS made a half-hearted effort to reinstate its registration. It submitted an application to renew its authority on April 6, 2007, or approximately two weeks before it inked the first sales agreement with Mangione. However, that

application was fatally defective as it lacked among other things, a Renewal Application Cover

Supplemental Information and Certification Form.

PRS had not received approval of its application when it entered into its first agreement

with Mangione on April 24, 2007. In fact, PRS would not receive authorization to offer and sell

franchises in New York State until August 21, 2007. In the interim, PRS had sold some twenty

franchises to Mangione and collected $714,000.00 from him for this purpose.

At trial, PRS and the Butlers asserted that they believed their renewal application to be

timely and that under New York law, they were permitted to continue to offer or sell franchises

while that application was pending.  Their explanation is not believable. However, even if it

were, PRS was required to provide the Plaintiff with an amended prospectus after it had been

accepted by New York State under N.Y.C.R.R. Section 200.3(i)(3).  While the amended

prospectus and application were pending, PRS was required to escrow Mangione's franchise fees

in a separate trust account.

To date, Mangione has still never received an amended prospectus from PRS. And as

described above, his funds were never escrowed. Rather they were immediately dissipated, with

half of these sums going to Distenfield as sales commissions and the other half to PRS, PR Store,

and Design Central. A sizeable amount was paid over to the Butlers in salaries.  Meanwhile,

having bought franchises for multiple store locations in New York at the cost of $714,000,

Mangione found himself unable to even operate his single open PR Store, because the franchisor

was not providing the necessary product.

Desperate, in early 2008, Mangione met with Mike Butler in New York, who by this time

had acquired the mantle of CEO of PR Stores, his wife's nephew Fragen having left the business.

Mangione floated a variety of ideas by which Mangione might deal with these problems and try

to recoup some of his investment. Not at all chagrined by the franchisor's prior misdeeds or financial impotence, Butler suggested that Mangione might contribute more monies in order to purchase a minority equity interest in the franchisor.

By the end of 2008, Mangione realized he had been had.  Seeking relief, he contacted the New York State Attorney General. He then learned that PRS had not been registered or authorized to operate in New York State at the time when it sold him his franchises.  He filed a complaint with the New York Attorney General.  On August 14, 2009, New York issued a letter advising Butler that PRS was not to sell any further franchises in that State.  Then, on August 24, 2009, the Attorney General again wrote PRS and Mike Butler. That letter advises PRS that it was not in compliance with New York State law, that it was not authorized to sell the franchises to Mangione, and that it was required to escrow his franchise fees.  The letter advised that Mangione was entitled to rescind the contract and a return of his money together with interest at the statutory rate of 6% from the date of purchase plus his reasonable costs and fees.  Mike Butler responded to the Attorney General by denying and attempting to refute the State's allegations, but to no avail.

Meanwhile on August 27, 2009, Mangione wrote his rescission letter and demanded the return of his $714,000.00. By October 6, 2009, he had filed suit in New York against PRS attempting to recover his investment. Shortly thereafter on December 14, 2009, the Butlers dissolved PRS. They filed personal bankruptcy under Chapter 7 in this judicial district on July 15, 2010. Hoping to discharge any personal liabilities they might owe to Mangione, the Butlers listed Mangione as a creditor. They did not dispute owing a liability to Mangione, or assert that the obligation was contingent or unliquidated; however, rather than the $714,000 which Mangione paid, the Butlers valued their obligation to Mangione at a single dollar.

## STATEMENT OF POSITIONS

Mangione maintains that the Butlers and PRS made material misrepresentations to him and indeed perpetrated a fraud in the solicitation of his franchise purchases. These representations included the affirmative assertion that PR Store was a profitable franchise of which PRS, et al. had the ability to support and further the implied representation (by silence) that PRS and the Butlers had the capacity to sell these franchises in the State of New York. Mangione contends that the Butlers are jointly and severally liable with PRS for his franchise payments totaling $714,000.00 plus interest, costs and attorney's fees. He maintains the debt is non-dischargeable under 11 U.S.C. § 523(a)(2).

Further, Mangione asserts that this personal obligation of the Butlers also represents a debt for fraud or defalcation while acting in a fiduciary capacity within the meaning of § 523(a)(4). Here the essential assertion is that the Butlers, member-managers of PRS, failed to escrow the funds paid by Mangione in a trust or escrow account as dictated by New York law, failed to provide the amended approved prospectus, and then thereafter, upon Mangione's demand for rescission, failed to remit $714,000.00 to him in direct violation of New York State law. Instead, they personally participated and benefitted from the dissipation of his payments, effectively a defalcation and/or fraud by two fiduciaries.

The Butlers, on the other hand, assert that at the time Mangione's investment was solicited, PRS had applied for re-registration and was authorized under 13 C.R.N.Y. 200.3 to continue to solicit and advertise for sales for franchises. Even if it were not, the Butlers maintain that they had no significant involvement in PRS. They argue that solicitation of Mangione's purchases was conducted by the CEO of PRS, Daniel Fragen and the franchise broker for PRS, Ira Distenfield. The Butlers maintain that their involvement was limited to operating Design

Central, the creative arm of the franchisor.  If any misrepresentations were made or defalcation occurred, the Butlers argue that these misdeeds were carried out by, and the resulting liabilities were owed by PRS.  As individuals, the Bulters deny perpetrating any misstatements or fraudulent actions on Mangione whatsoever.

## CONCLUSIONS OF LAW

**I.**    **The Butlers are personally liable to Mangione under New York law.**

Based on the evidence presented at trial, the Butlers are personally liable to Mangione under New York law.

Under McKinney's Consolidated Laws of New York Annotated, General Business Law § 683(1), it is unlawful to sell a franchise unless an offering prospectus is filed. The purpose of this statute is to remedy abuses on fraudulent sales of franchises.  Here it is undisputed that PRS et. al., failed to provide any offering prospectus to Mangione.  In fact, and as attested to by Mike Butler, PRS had intentionally allowed its franchise license in New York to lapse. Despite this, PRS et. al. knowingly and willingly sold these New York franchises to Mangione in violation of New York law.  Even though Mike Butler testified that the application for reinstatement of the franchise license was in process, the application was defective and it was lodged after negotiations with Mangione began.  The management of the franchisor, including the Butlers, was aware that PRS was not entitled to operate or solicit money in New York at the time the agreements were signed and Mangione paid his monies.

In addition to failing to provide the amended prospectus, PRS failed to escrow the franchise fees, as required under N.Y. Comp. Codes R. & Regs. tit. 13, § 200.3(h)(i)(3):

> A franchisor making an offer, selling or advertising following the occurrence of an event requiring an amendment shall advise its offeree, in writing, at the time it supplies the offeree with its registered prospectus, that an event requiring amendment has occurred and that an amendment application has been submitted, or will be submitted to the

department within 10 business days of such event, and shall supply its offeree with a copy of its amended prospectus when it has been accepted for filing and registered by the department. Any funds paid by the offeree to the franchisor shall, upon their receipt, be held in trust in a separate bank account and shall remain in trust from that time until 10 business days following the date on which the offeree is supplied a copy of the registered amended prospectus. Prior to receipt by the offeree of the registered amended prospectus or within 10 business days following its receipt of the registered amended prospectus, the offeree may rescind the sale and if it does, the franchisor shall pay the trust funds to the offeree forthwith. If the offeree does not rescind either prior to receipt of the registered amended prospectus, or during the 10-day period following receipt of registered amended prospectus, then its acceptance shall remain in force and the funds shall be released from trust and their disposition shall be subject to the agreement made between the franchisor and offeree. If the department refuses to register the amended prospectus, then the franchisor shall, upon such refusal, immediately pay the trust funds to the offeree.

Rather than escrow Mangione's payments, PRS dissipated the $714,000, such that when Mangione demanded return of his investment, PRS (even if it were so inclined) could not perform.

Under New York law, specifically General Business Law § 691, civil remedies are available to persons who have been damaged by the unlawful sale of a franchise. Section 691 provides for damages with interest at 6% from the date of purchase, plus reasonable attorney fees and court costs, and allows rescission of the franchise agreement. Thus, Mangione is entitled to rescission of the franchise agreement(s) and return of the $714,000 paid by him, plus 6% interest from May 7, 2007, and recovery of his attorney fees and costs. The interest is calculable. However, to date, no itemization of Mangione's attorneys fees and costs has been presented.[1]

The Butlers would shift legal responsibility for these unlawful acts to others, particularly PRS and Distenfield. They maintain that the liability is a corporate obligation of PRS, not a personal liability. They contend that at the times in question, they were running Design Central,

---

[1] The attorneys fees owed may be addressed by a supplemental affidavit of Mangione's counsel and supplemental judgment. It need not further delay entry of a judgment for the primary liability.

not PRS. Further, the Butlers contend that it was Distenfield, and not them, who negotiated the sale of these franchises with Mangione. None of these arguments is availing.

First, it should be noted that Distenfield was not an owner, manager or employee of the franchisor; rather, he was simply an agent. As such, Distenfield was not in a position to operate or direct the activities of the franchisor. Under the doctrine of respondeat superior, PRS and potentially the Butlers as the parties putatively controlling its actions (discussed below) are liable for the unlawful solicitation which was admittedly undertaken on behalf of the franchisor and within the scope of his agency.

Second, while PRS is certainly liable to Mangione for the unlawful sale of the franchises, this does not mean the Butlers are not liable as well. Two related legal doctrines apply here. At the outset, the corporate shield doctrine by which the Butlers would insulate themselves from personal responsibility by blaming PRS, does not protect them. Officers are personally liable for their participation in tortious acts that cause harm to a third party. E.g., *Wilson v. McLeod Oil Co., Inc.,* 327 N.C. 491, 517, 398 S.E.2d 586, 600 (N.C.1990); *Fletcher v. Dakota, Inc.*, 948 N.Y.S.2d 263 (App. Div. 1st Dep't 2012). (A corporate officer who participates in the commission of a tort may be held individually liable, regardless of whether the corporate veil is pierced).

More specifically under New York franchise law, "[i]f one of the individuals or entities defined as a person directly participates in an unlawful offer or sale, there is civil liability for the purchaser's resulting damages under [General Business Law] section 691(1)." *A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc.*, 87 N.Y.2d 574, 663 N.E.2d 890 (N.Y. 1996).

Applying these related principles to the present circumstance, the testimony presented at trial shows that the Butlers were personally involved in Mangione's solicitation. The franchises were sold to Mangione by promoting the Butlers as the key members of the franchisor in the advertising materials. Both the advertising materials and the Butlers themselves represented that they could provide the support that Mangione needed to start up his PR Store franchises.

Distenfield, the franchise broker, acted under the supervision of the Butlers, to whom he told Mangione he spoke two or three times a day. Distenfield told Mangione that he would talk with the Butlers about Mangione becoming a franchise owner. Distenfield, as broker and agent of the franchisor, solicited Mangione's money, taking his cues from the Butlers. Clearly, in the mind of the broker and thus Mangione, this was the Butlers' business.

Then, after his preliminary conversations with Mangione, Distenfield directed the prospective franchisee to the Butlers. Mangione traveled to Charlotte where the Butlers lived and worked. Mangione visited Charlotte and met with both of the Butlers about his contemplated purchase. He was 'sold' in these meetings with the Butlers.

Both Distenfield and the Butlers were personally involved in Mangione's solicitation.

This is hardly surprising given that the PR Stores concept was the Butlers' idea. PR Store, PRS and Design Central were the Butlers' creations. In point of fact, only the Butlers had the career background to provide the public relations services, the sold product which the PR Stores were to sell.

Obviously, the Butlers fragmented their business between three individual corporations: PR Stores (holding company); PRS (franchise sales); and Design Central (at least in theory provider of the product sold by the franchisees to customers). Nevertheless, these entities functioned as a single business, both in regard to their operations, such as they were, and in terms

of the way money followed between the companies. Mangione made his payments and on receipt, his money was divided out and shared between the corporations and the outside broker. Given the circumstances, it is clear that the Butlers were the primary decision-makers in how that money was divided. As employees of PRS and Design Central, with relatively high salaries, they also were the beneficiaries of that solicitation. Mangione's money was used in large part to fund their salaries.

At certain points in time, others had a role in the Butlers' business. In addition to Distenfield the franchise broker, Kathy Butler's son-in-law Dan Fragen served for a time as an employee and member-manager of PRS. Even so, from beginning to end, this was the Butlers' business both as to primary ownership and active control. Because the Butlers controlled these companies, directly participated in the unlawful sale of the franchises to Mangione, and profited from his payments, under traditional corporate law and General Business Law § 691, the Butlers are personally liable to Mangione for this debt.

## II.   Pursuant to 11 U.S.C. § 523, Mangione's Claims Against the Butlers Are Not Dischargeable.

Bankruptcy relief is reserved for the honest, but unfortunate debtor. This fundamental maxim is recited in the legislative history to the Code and hundreds of bankruptcy case decisions. *See Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007) (citing *Grogan v. Garner*, 498 U.S. 279, 286, 287, 11 S.Ct. 654, 112 L.Ed.2d 755 (1991)). This principle is also reflected in Code Section 523(a) and the exceptions to discharge found therein. *See* 11 U.S.C. § 523(a); *In re Strack*, 524 F.3d 493, 497 (4th Cir. 2008). Of particular significance here, 11 U.S.C. § 523(a) provides, in relevant part, that:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title
> does not discharge an individual debtor from any debt--

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(2)(A) and (a)(4). On these facts, each of these sections render Mangione's claims against the Butlers non-dischargeable in bankruptcy.

### a. 11 U.S.C. § 523(a)(2)(A) — Mangione's Claims Survive the Butlers' Discharge Because The Claims Arose from the Butlers' Fraudulent Conduct.

Under Section 523(a)(2)(A), a debtor's debts for money obtained by "false pretenses, a false representation, or actual fraud" are not dischargeable as a result of his bankruptcy. 11 U.S.C. § 523(a)(2)(A). The Fourth Circuit has observed that the purpose of this exception is "to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means." *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219-20 (4th Cir. 2007). This exception includes all liability arising from fraud, including punitive damages. *See Cohen v. DelaCruz*, 523 U.S. 213, 118 S. Ct. 1212 (1998).

The meaning of the phrases "false pretenses," "false representation," and "actual fraud" are based upon the common understanding of those terms at the time § 523(a)(2)(A) was enacted. *See In re Mileski*, 416 B.R. 210, 224 (Bankr. W.D.N.C. 2009). In order to arrive at such understanding of the phrase "actual fraud," the United States Supreme Court has looked to the Restatement (Second) of Torts. *See Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Under the Restatement, "a plaintiff must prove four elements: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiffs justifiable reliance on the misrepresentation." *In re Mileski*, 416

B.R. at 224, quoting *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 134 (4th Cir. 1999). A defendant's statement of intention is fraudulent only where he did not actually have that intention at the time the representation was made. *See id.*; *see also* Restatement (Second) of Torts § 530(1) (1976).

The fraudulent misrepresentation element is satisfied if the debtor's representation was known to be false or recklessly made without knowing whether it was true or false. *See Boyuka v. White (In re White)*, 128 Fed. Appx. 994, 998 (4th Cir. 2005) (unpublished opinion) (citing *In re Woolley*, 145 B.R. 830, 834 (Bankr. E.D. Va. 1991)). In *White*, the Fourth Circuit found that a failure to disclose the fact that one is not licensed to sell securities is a reckless misrepresentation. *Id.* at 1000. The *White* court also observed that the bankruptcy court was correct in finding that the reckless misrepresentations combined with their endorsement of promotional claims sufficed to form the scienter necessary to deny discharge. *Id.* at 1001.

In the present case, Mangione contends that the Butlers intentionally made at least two false representations to him in soliciting his franchise purchase: (1) that the franchises they were selling were profitable, and (2) that PRS had the capacity to sell franchises in New York.

Little evidence was presented at trial regarding the profitability of the franchises at the time of the solicitation; all we have is the fact that the businesses were defunct less than a year later. Nor was there evidence that the Butlers intentionally misrepresented the same. I cannot conclude on this record that this was a material false misrepresentation.

However, the Butlers did misrepresent that PRS was legally able to sell New York franchises to Mangione and knew at the time that this was false. By soliciting Mangione's investment for franchises in New York, the Butlers implicitly represented to him that they had the legal capacity to sell franchises in New York. However, the Butlers knew that was not the

case. Rather, they had intentionally allowed the PRS license to sell franchises to lapse. Mangione should have been told of the status of the license. The Butlers' failure to speak induced Mangione to purchase the franchises. Further, the Butlers intended that Mangione rely on their misrepresentations. This failure to disclose material facts meets the fraudulent misrepresentation standard set out in *White*.

The second and third elements required for a non-dischargeable debt under § 523(a)(2)(A), inducement and proximate harm, are both readily apparent. Mangione was induced by the Butlers' representations to buy the franchises. Unaware of the fact that the franchisor was not able to sell those franchises, Mangione paid $714,000 to their company to purchase the franchises. He now is out that sum for franchises which, by virtue of the Butlers' entities' failure to perform, are worthless.

The final element is whether Mangione justifiably relied upon the Butlers' statements. To satisfy the justifiable reliance requirement, the creditor must prove it actually relied upon the debtor's misrepresentations and that the reliance was justified. *See Andresen & Arronte, PLLC v. Hill (In re Hill)*, 425 B.R. 766, 777 (Bankr. W.D.N.C. 2010) (citing *Colombo Bank v. Sharp (In re Sharp)*, 340 Fed. Appx. 899, 903 (4th Cir. 2009)).

The Court finds that Mangione did justifiably rely on the Butlers' statements. Mangione testified that he had at least 100 conversations with Distenfield about purchasing the franchises, and that he did his own separate due diligence. He also spent time with the Butlers, discussing the New York market and the support he could expect from them and their company. There were no warning signs to Mangione that this was a bad investment, much less an unlawful sale. Mangione acted reasonably in relying on the Butlers' representations and those of their companies and agents.

In toto, for dischargeability purposes, these false representations constitute fraud by the Butlers. Thus, pursuant to Section 523(a)(2)(A), Mangione's claims should not be discharged.

### b.  11 U.S.C. § 523(a)(4) – Mangione's Claims Survive the Butlers' Discharge Because The Claims Arose from the Butlers' Defalcation.

Section 523(a)(4) excepts from a debtor's discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4); *see also In re Strack*, 524 F.3d 493, 497-98 (4th Cir. 2008). Thus, Section 523(a)(4) concerns three types of debts: (1) debts arising from fraud or defalcation while acting in a fiduciary capacity; (2) debts arising from embezzlement; and (3) debts arising from larceny. 11 U.S.C. § 523(a)(4). Mangione did not plead embezzlement or larceny, so we need only consider 'defalcation while acting in a fiduciary capacity'.

To prevail under this provision, a creditor must ordinarily make a two-part showing: (1) that the debt in issue arose while the debtor was acting in a fiduciary capacity; and (2) that the debt arose from the debtor's fraud or defalcation. *See Pahlavi v. Ansari (In re Ansari)*, 113 F.3d 17, 20 (4th Cir. 1997). Defalcation is simply "the failure to meet an obligation" or "'a non-fraudulent default.'" *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001), quoting Black's Law Dictionary 427 (7th ed. 1999). In order to constitute defalcation for purposes of Section 523(a)(4), an act need not "rise to the level of ... 'embezzlement' or even 'misappropriation'." *In re Strack*, 524 F.3d 493, 498 n.7 (4th Cir. 2008), (quoting *Ansari*, 113 F.3d at 20). Indeed, negligence or even an innocent mistake which results in misappropriation or failure to account is sufficient to except a debt from discharge under this provision. *See id.*; *see also In re Uwimana*, 274 F.3d at 811.

Here, the Butlers et. al. effectively stole money from Mangione. His franchise purchase monies were required to be escrowed under N.Y. Comp. Codes R. & Regs. tit. 13, §

200.3(h)(i)(3). Instead of doing so, the Butlers converted Mangione's franchise fees for their own use, as these monies were not escrowed but instead paid to PRS and then disbursed to the Butlers' other entities. A good portion of Mangione's money ended up being paid to the Butlers as part of their salaries.

New York law supplies the trust relationship and fiduciary duties with respect to the escrowing of the franchise fees. Thus, and the Butlers' failure to escrow these fees amounts to defalcation.  Further, even after Mangione demanded repayment, the Butlers et. al. failed to return the franchise fees to him. Again, this constitutes defalcation within the meaning of the statute. *See In re Strack*, 524 F.3d 493, 498 n.7 (4th Cir. 2008). Thus, the Butlers should not be entitled to discharge their obligations to Mangione under Section 523(a)(4).

## III.   The Butlers misled Mangione and this Court by misrepresentations made in discovery.

Finally, even if the aforementioned conduct by the Butlers did not warrant denial of dischargeability of Mangione's debt, their misconduct in this proceeding does. The Butlers made several misrepresentations in their discovery responses in this action. First, the Butlers represented in their discovery responses that they were not member-managers of PRS, when in fact they were. Further, the Butlers represented in their discovery responses that they did not sign checks, were not involved in sales, and did not control the money of the business, when in fact the evidence showed that they did. Finally, the Butlers failed to produce all documents that were requested by Mangione in discovery. Of those documents that were produced, several were delivered to counsel for Mangione the night before the trial began.  Obviously, in addition to their pre-petition actions, during the course of this litigation, the Butlers attempted to further mislead Mangione as well as to mislead this bankruptcy court. Such misrepresentations during this case justify an additional basis for denying the Debtors' discharge. *See Gwynn v. Walker* **(***In*

*re Walker*), 532 F.3d 1304, 1309 (11th Cir. 2009); U.*S. v. Moussaoui*, 483 F.3d 220, 236-37 (4th Cir. 2007) (citing *Degen v. U.S.*, 517 U.S. 820 (1996)).

Based on the above FINDINGS OF FACT and CONCLUSIONS OF LAW, Mangione is entitled to recover actual damages from the Butlers, jointly and severally, in the amount of $714,000 paid by him, plus 6% interest from May 7, 2007, plus attorney fees and the costs of this action. The Court will enter judgment against the Butlers by separate Order.

**SO ORDERED.**

**This Order has been signed electronically.**          **United States Bankruptcy Court**
**The judge's signature and court's seal**
**appear at the top of the Order.**